* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence REOPENS the record for receipt of additional evidence.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into between the parties in a Pre-Trial Agreement and during the hearing proceedings as:
 STIPULATIONS *Page 2 
1. On October 25, 1993, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On October 25, 1993, an employee-employer relationship existed between Plaintiff and Employer-Defendant.
3. October 25, 1993 is the date of the injury by accident which is the subject of this claim.
4. Employer was insured by Reliance Insurance Company on October 25, 1993. Reliance Insurance Company subsequently declared bankruptcy, and this case is now covered by the North Carolina Guaranty Association.
5. Plaintiff's medical records, consisting of 364 pages, were received into evidence as Stipulated Exhibit No. 1.
6. The deposition of Melvin Cheatham, M.D. was received into evidence as Stipulated Exhibit 2.
7. The Stipulations with Request for Award was received into evidence as Stipulated Exhibit 3.
8. The issues for hearing before the Deputy Commissioner were:
 a. What is Employee-Plaintiff's average weekly wage?
 b. Is Employee-Plaintiff entitled to benefits under N.C. Gen. Stat. § 97-29 for temporary total disability benefits following his date of injury on October 25, 1993?
 c. Is Employee-Plaintiff entitled to benefits pursuant to N.C. Gen. Stat. § 97-30 for loss of wage earning capacity following his injury on October 25, 1993? *Page 3 
 d. On what date did Employee-Plaintiff reach maximum medical improvement as a result of his injury of October 25, 1993?
 e. Did Employee-Plaintiff subsequently sustain a change of condition pursuant to N.C. Gen. Stat. § 97-47 as a result of his surgery on August 30, 2001?
 f. Is Employee-Plaintiff entitled to benefits under N.C. Gen. Stat. § 97-29 for temporary total disability benefits following his surgery of August 30, 2001?
 g. Is Employee-Plaintiff entitled to payment of benefits for a permanent impairment rating following his surgery of August 30, 2001?
 h. Is the Screen Actors Guild entitled to be reimbursed for medical expenses paid on behalf of Employee-Plaintiff for treatment for his injury of October 25, 1993?
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, Employee-Plaintiff was a 63-year old male, born June 26, 1943 and had worked as a stuntman for over 35 years. During the course of his career, Employee-Plaintiff had worked as a stunt double for Paul Newman and Burt Reynolds and had been employed in various movies and television programs as either a stuntman or stunt coordinator. These movies and television series included "The Undefeated," "Little Big Man," "Dan August," "Vegas," "Airport 77", "Hooper," and "The Last of the Mohicans". Plaintiff's *Page 4 
reputation and career were based on high-impact, big stunts. Plaintiff was hired specifically for these stunts. Plaintiff was employed as a NASCAR driver and had set the world land speed record in 1979 by being the first person to break the sound barrier in a vehicle. Employee-Plaintiff had a fusion performed at the L4-5 level and L5-S1 level prior to the injury that is the subject of this matter. Employee-Plaintiff had also undergone a previous fusion at the C5-6 level. Plaintiff had returned to active high impact stunt performing following his recovery from these surgeries.
2. On October 25, 1993, Employee-Plaintiff was employed as a stuntman and stunt coordinator on "Bandit, Bandit", a television series being filmed in North Carolina. He had been so employed for six weeks. As part of his job as a stunt coordinator, Employee-Plaintiff was responsible for performing all of the high impact stunts. Employee-Plaintiff's sons were also working on this job site with him.
3. The television series was being filmed in Wadesboro, North Carolina. Employee-Plaintiff was residing in Boone, North Carolina, at the time of his accident.
4. On October 25, 1993, Employee-Plaintiff was performing a stunt that involved jumping a car approximately 120 feet. During the process of performing this stunt, plaintiff was going 70 mph. The car landed awkwardly on one side due to a breaking shock and snapped sideways. When the car stopped, Employee-Plaintiff felt immediate pain in his low back and neck.
5. Employee-Plaintiff had intense pain in his back and this pain radiated into his leg. Plaintiff couldn't move his legs. He also had pain in his neck. He was taken to Charlotte and examined by Dr. Scott McLanahan. Dr. McLanahan found plaintiff had lumbar pain secondary to trauma and ordered a CT scan. The CT scan, performed the same day, revealed an attempted *Page 5 
fusion at L5-S1 as well as L4-5. Dr. McLanahan instructed plaintiff not to participate in stunt work the next day as it would be unsafe.
6. On October 28, 1993, Dr. McLanahan found plaintiff had a pseudarthrosis at L5-S1 and noted that Employee-Plaintiff would need to "have something done at the L5-S1 level."
7. Employee-Plaintiff returned to the job site and attempted to continue to coordinate stunts. At that time, his sons were working on the project and he was concerned for their safety since he was supervising the stunts.
8. On November 2, 1993, Dr. McLanahan noted that Employee-Plaintiff's continued work as a stunt driver exposed him to considerable risks.
9. Employee-Plaintiff continued to experience significant pain in his back and left leg. On November 8, 1993, he was seen by Dr. Gary Pitts who diagnosed him with a contusion through his kidney and his bladder.
10. Due to his symptoms, Employee-Plaintiff was unable to continue his work as a stuntman performing high impact stunts.
11. Employee-Plaintiff returned to Dr. McLanahan on May 23, 1995. At that time, he was complaining of low back pain which radiated into both legs with the left side being worse than the right. He also noted that he had pain in his neck. Dr. McLanahan recommended that Employee-Plaintiff have new studies performed.
12. Employee-Plaintiff returned to Dr. McLanahan in May of 1996. A CT scan was performed on May 28, 1996 revealing segment instability at L5-S1. Dr. McLanahan recommended that Employee-Plaintiff be seen by Dr. Finger for the problems that he was having with his low back. *Page 6 
13. Employee-Plaintiff's work as a stunt coordinator and as a stuntman required him to do high impact stunts. The stunt coordinator position, while supervisory in nature, requires a stuntman who can perform difficult and dangerous stunts to instruct others in how to perform the stunt and to place rigging. It is a job that is very physical in nature. Following his injury of October 25, 1993, Employee-Plaintiff was limited in his ability to obtain employment due to his limited ability to perform stunts; however, he did have some earnings.
14. Employee-Plaintiff presented to Dr. Melvin Cheatham, a neurosurgeon in California, on August 6, 1997 with mild neck discomfort and stiffness with a restriction of range of motion in his neck. Dr. Cheatham was of the opinion that the fusion at L5-S1 had been broken loose as a result of the October 25, 1993, injury and that there had been a fracture of the L2 vertebral body as a result of the injury. Dr. Cheatham recommended Employee-Plaintiff be treated conservatively and avoid any high impact stunt activities.
15. Employee-Plaintiff was unable to continue his work except on a sporadic basis. The employment he obtained was not based upon his capabilities but upon friendship gestures, and plaintiff did not perform physical stunts. His income was limited as a result of this injury that he sustained in 1993. Although the record contains evidence of a Form 60 there is no evidence concerning what payments, if any, were made to Plaintiff for disability following his injury.
16. After continued worsening of his low back symptoms, on August 30, 2001, employee-plaintiff underwent low back surgery performed by Dr. John Peloza to repair his October 25, 1993 injuries.
17. Employee-Plaintiff was discharged on September 2, 2001. Following his discharge, Employee-Plaintiff traveled to Connecticut in order to recuperate from his surgery. *Page 7 
18. While in Connecticut, Employee-Plaintiff began developing severe pain in his low back at the surgical site and developed swelling from fluid collection in the area. He was unable to return to Dallas to see Dr. Peloza due to the catastrophic events of September 11, 2001. He eventually traveled to North Carolina with his son in the later part of September 2001. He was referred to Dr. Charles Branch, the Chairman of the Department of Neurosurgery at the Bowman Gray School of Medicine.
19. Dr. Branch diagnosed Employee-Plaintiff with a dural tear and a spondylothesis with foraminal stenosis at L5-S1. Employee-Plaintiff underwent surgery on September 28, 2001. Employee-Plaintiff was discharged on October 2, 2001, and was advised by Dr. Branch not to bend, stoop, lift, drive, move furniture or do any strenuous activity.
20. Dr. Charles Branch was of the opinion that Employee-Plaintiff reached maximum medical improvement following his September 28, 2001 surgery by September 1, 2003. Dr. Branch was of the opinion that Employee-Plaintiff retained a 35% permanent partial impairment to his back as a result of his October 25, 1993 injury. Dr. Branch recommended that Employee-Plaintiff not return to any physically demanding job and felt that plaintiff could perform sedentary work. Dr. Branch was of the opinion that Employee-Plaintiff's injuries of October 25, 1993, were directly related to the conditions for which he treated plaintiff in 2001. Dr. Branch was further of the opinion that Employee-Plaintiff bears a substantial risk of the need for future medical treatment as a direct and proximate result of his October 25, 1993 compensable injury, which resulted in the need for his August 30, 2001 surgery.
21. Employee-Plaintiff has not been able to return to work at the same or greater average weekly wage since reaching maximum medical improvement on September 1, 2003. *Page 8 
22. Since Employee-Plaintiff's injury by accident on October 25, 1993, he has been able to perform some sporadic work for various periods of time and Defendants are entitled to a credit for the wages that Employee-Plaintiff earned during this period of time.
23. Following his designation of maximum medical improvement by Dr. Branch on September 1, 2003, Employee-Plaintiff is able to elect a more favorable remedy as to his permanent impairment rating. Employee-Plaintiff retains a 35% permanent partial impairment rating to his back as a result of his injury. Employee-Plaintiff is entitled to the payment of those benefits pursuant to N.C. Gen. Stat. § 97-31.
24. Defendants have alleged that they are entitled to a credit for any previous permanent partial impairment ratings paid to Employee-Plaintiff. There is no evidence to support a finding that Employee-Plaintiff was paid based on a permanent partial impairment rating for a previous injury to his back.
25. The medical treatment rendered by Dr. Scott McLanahan, Dr. Gary Pitts, Dr. Melvin Cheatham, Dr. John Peloza, and Dr. Charles Branch was necessary to effect a cure, give relief or lessen the period of disability as a direct and proximate result of plaintiff's October 25, 1993 compensable injury.
29. Defendants are responsible for all medical treatment, devices and aides, including but not limited to that recommended by Dr. Charles Branch to assist Employee-Plaintiff in his recovery, as they were reasonable and necessary to effect a cure, give relief or lessen the period of disability.
30. Plaintiff bears a substantial risk of the need for future medical treatment as a result of his compensable condition. *Page 9 
31. A Form 22 Wage Chart was not completed by Defendant indicating Plaintiff's wages. Plaintiff was not employed by Defendant-Employer for the 52 weeks preceding his injury. Thus, Methods 1 and 2 of N.C. Gen. Stat. § 97-2(5) are not available for calculating Plaintiff's average weekly wage. Method 3, dividing the earnings of Plaintiff by the weeks worked for Defendant-Employer, will not result in the most fair and just result to both parties considering the casual nature of his employment and Plaintiff's prior employment history. Method 4, determining the wages of a similar employee is not available as there is no employee with employment similar to Plaintiff. Because exceptional circumstances exist in this case Method 5 is the most fair and just method to use to compute Plaintiff's average weekly wage at the time of injury in order to reach a result that would most nearly approximate the amount Plaintiff would be earning were it not for the injury. In the 52 weeks prior to his injury Plaintiff worked for different employers. He had periods where his earnings were high and periods where he did not work at all. Plaintiff was employed for approximately six weeks with Defendant-Employer on the television series of "Bandit, Bandit." During this six-week period, he earned $61,806.54 for his services as both the stunt coordinator and as a stuntman. Employee-Plaintiff's average weekly wage on this contract was $10,301.09 per week. Based on the evidence presented the Full Commission is unable to determine Plaintiff's earnings over the preceding year before his injury because fourth quarter earnings for 1992 were not presented and Plaintiff's earnings would have been for other employers not reflected in the evidence of record. Plaintiff's earnings qualified him for the maximum compensation rate of $442.00 for 1993 but additional evidence is needed to calculate the average weekly wage. Until an average weekly wage is determined the Full Commission is unable to determine the more favorable remedy for Plaintiff. *Page 10 
 * * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following additional
 CONCLUSIONS OF LAW
1. Employee-Plaintiff sustained an injury by accident arising out of and in the course of his employment with Employer-Defendant on October 25, 1993. N.C. Gen. Stat. § 97-2(6)
2. At the time of his injuries, Employee-Plaintiff's average weekly wage qualified him for the maximum compensation rate for the year 1993 of $442.00 per week. Plaintiff's average weekly wage should be calculated using Method 5 of N.C. Gen. Stat. § 97-2(5).
3. The treatment rendered by the following doctors was a result of plaintiff's compensable condition, was reasonable and necessary to effect a cure, provide relief and lessen plaintiff's disability and plaintiff is entitled to have defendants provide the same:
 a. Dr. Scott McLanahan and the physicians at Carolina Neurosurgery;
 b. Dr. Gary Pitts at Boone Neurology;
 c. Dr. Melvin Cheatham;
 d. Dr. John Peloza; and
 e. Dr. Charles Branch.
4. Plaintiff bears a substantial risk of the necessity of future medical treatment as a result of his compensable injury and is entitled to have defendants provide the same.
5. The record herein needs to be reopened to obtain additional evidence on Plaintiff's average weekly wage and what, if any, prior compensation has been paid to Plaintiff for this injury.
 * * * * * * * * * * * *Page 11 
The foregoing stipulations, findings of fact and conclusions of law engender the following
 AWARD
1. Defendants shall provide for the payment of medical compensation reasonably necessary to effect a cure, give relief or lessen the period of disability related to Employee-Plaintiff's compensable injury, including but not limited to payment for treatment by Carolina Neurosurgery, Boone Neurology, Dr. McLanahan, Dr. Pitts, Dr. Peloza, Dr. Cheatham and Dr. Branch.
2. Defendants shall pay the costs of this action including expert witness fees, which are hereby approved, to Dr. Charles Branch in the amount of $550.00 and to Dr. Melvin Cheatham in the amount of $1,285.00.
IT IS HEREBY ORDERED that the record is reopened for receipt of additional evidence on Plaintiff's average weekly wage, the prior compensation paid to Plaintiff for this injury and the dates compensation was paid. The Full Commission shall retain jurisdiction over this claim and further proceedings. The parties shall confer and notify the Commission on how they intend to provide the additional evidence ordered. All other issues are RESERVED.
This the ___ day of January 2008.
S/____________________ BERNADINE S. BALLANCE COMMISSIONER
 CONCURRING: *Page 12 
 S/____________________ DANNY LEE McDONALD COMMISSIONER
 S/____________________ BUCK LATTIMORE COMMISSIONER *Page 1